# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

ANTHONY IZUOGU,

     *Plaintiff,*

     v.

CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, NEW YORK (CACIB),

     *Defendant.*

## COMPLAINT

Plaintiff (*Pro Se*) Anthony Izuogu complains of Defendant Credit Agricole Corporate and Investment Bank, New York as follows:

## INTRODUCTION

1. This is a Civil Rights complaint for workplace discrimination and retaliation in violation of Title VII of the Civil Rights Act 1964, New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131, 42 U.S.C. § 1981, 42 U.S.C. §§ 2000e to 2000e-17 and worker misclassification in violation of Fair Labor Standards Act (FLSA), New York labor laws.

2. The Plaintiff was employed through Aramark Services Inc as "Event/Catering Coordinator" for the Defendant between December 2020 and May 15 2022 at the Defendant's New York Headquarters at 1301 Avenue of the Americas New York, NY 10019. During this time, certain leadership personnel of the Defendant, namely Michael

Colon and Milan Patel targeted and subjected the Plaintiff, a Black African adult male of Nigerian nationality, to a sustained pattern of harassment, intimidation, aggression and hostility, demeaning mistreatments, and exploitation on the basis of his membership of the aforementioned protected class. In addition, the Defendant willfully misclassified the Plaintiff as an independent contractor whereas Plaintiff was in practice an employee, and was denied all the benefits extended to other employees.

3. Whereas the representation made to the Plaintiff was that the Plaintiff was to be an independent contractor relative to the Defendant for the role of "Event/Catering Coordinator", shortly after commencing the job, the Defendant substantially altered and expanded the work tasks of the Plaintiff, including multiple tasks completely unrelated to Event Coordination, and assumed direct and operational control, direction, training and supervision of the daily work of the Plaintiff in the said multiple additional duties the Defendant placed on the Plaintiff, thereby treating the Plaintiff as an employee, but denying the Plaintiff all the benefits accorded all other employees of the Defendant on the basis of the Plaintiff's race and national origin.

4. The Defendant's deliberate actions created hostile work environment for the Plaintiff and caused the Plaintiff considerable mental/emotional distress as well as medical harm, and resulted in constructive dismissal of the Plaintiff from the job. Furthermore, the Defendant demanded that direct adverse employment actions be taken against the Plaintiff in retaliation for the Plaintiff's opposition to mistreatment by the Defendant.

5. The Plaintiff was meeting the Defendant's legitimate expectations for the job as evidenced in writing.  There were no legitimate job performance-related justifications for the sustained harassment coming from agents of the Defendant against the Plaintiff.

6.  Being constantly pressured by the Defendant and being privy to communications from the Defendant relative to Plaintiff, when in May 2022 Plaintiff pressed his supervisor Georgia Gordon on why the named Defendant's agents were hostile to the plaintiff, the supervisor told the Plaintiff that discriminatory behavior towards the Plaintiff by the agents of the Defendant was obviously motivated by racial and nationality bias against the Plaintiff by the said agents of the Defendant. The supervisor then told Plaintiff that she had spoken with Robert Mapes regarding the constant agitation from Michael Colon and Milan Patel for employment action to be taken against Plaintiff, and that Robert Mapes had asked her to give him an honest assessment of the performance of the Plaintiff, and that she categorically told him that the Plaintiff was professional to the core. That honest assessment by Plaintiff's supervisor was to re-emphasize that the persistent hostile behavior of the agents of the Defendant towards the Plaintiff had less to do with objective work performance and more to do with bias.

7.  The Plaintiff was treated adversely differently from similarly situated workers such as Theresa Cappelli.

8.  When the Plaintiff complained and opposed the mistreatments, the Defendant immediately retaliated by sending Plaintiff home for several days and thereafter increased their harassment, intimidation and concerted efforts to terminate Plaintiff's employment.

### VENUE AND JURISDICTION

9.  Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because all the conduct in the complaint or the causes of action occurred in the district of this Court.

10. This Court, pursuant to 28 U.S.C. §§ 1331 and 1343, has sufficient jurisdiction over federal claims contained in the complaint.

11. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state claims contained in the complaint.

12. Furthermore, pursuant to 28 U.S. Code § 1332, on account of diversity of citizenship of the parties, this Court has jurisdiction to adjudicate this action which also involves state law and claims; whereas the Defendant is a citizen of New York State, the Plaintiff is a citizen and resident of the Texas.

## PARTIES

13. The Plaintiff is an adult Black African male with current primary residence in the State of Texas. However, the Plaintiff was a resident of New Jersey during the period of the employment on which this action is based, but has since then relocated to Texas. The Plaintiff worked for the Defendant from December 2020 to May 2022.

14. The Defendant Credit Agricole CIB, NY is a corporate and investment bank owned by Credit Agricole S.A. headquartered in Paris, France. Defendant has primary business location in the district of this Court.

## PROCEDURAL BACKGROUND

15. Plaintiff has exhausted administrative remedies at the New York State Division for Human Rights (NYSDHR) and the Equal Employment Opportunity Commission (EEOC).

16. The US EEOC, in adopting the no probable cause determination of the NYDHR (**see Attached Exhibit A**) which was the investigating agency, stated categorically that it is not the determination of the EEOC that the Defendant did not violate relevant laws, hence issued the Plaintiff a Notice of Right to Sue dated February 29, 2024 which the plaintiff received on March 10, 2024 (**See attached Exhibit B**).

17. This complaint is therefore filed within 90 days of Plaintiff's receipt of the said EEOC Notice of Right to Sue.


## ALLEGATIONS OF FACT

*Unlawful Workplace Harassment and Retaliation:*

18. In December 2020, Plaintiff Mr. Izuogu was hired through Aramark Services Inc to work for Defendant Credit Agricole CIB as Event/Catering Coordinator. Plaintiff's job was described to him as planning and coordinating events for the Defendant, managing allocation of conference and meetings rooms, coordinating catering orders and setups for meetings and events.

19. Whereas Plaintiff initially was reporting directly to Ross Chasko who was later succeeded by Georgia Gordon (both of Aramark Services Inc), leadership agents of the Defendant namely, Michael Colon and Milan Patel, quickly got involved in Plaintiff's work routine, assigned several and various new work responsibilities to the Plaintiff and started mounting a campaign of discriminatory harassment against the Plaintiff. Some of the said mistreatments are recounted below:

### a.  *Michael Colon knowingly falsely accused Plaintiff*

Sometime in 2022, Nicole Baltzer, an employee of the Defendant approached the Plaintiff with a last-minute request for a meeting space on the 19th floor. Plaintiff asked her if the planned meeting needed desk for writing and beverage placement. She said yes.

Unfortunately, all the standard conference spaces on the floor were already reserved for other meetings. The only available spaces were unsuitable for the said meeting. Plaintiff's space booking privileges were mostly restricted to 19th floor rooms and one so-called tele-presence room on the 20th floor. Nicole asked Plaintiff about a meeting room on the 14th floor which did not fall under Plaintiff's space reservation purview. Plaintiff immediately tried to contact "PCS" which was the unit of the Defendant in charge of facilities to find out if the 14th floor space was available and how to release it to Nicole, but Nicole dissuaded Plaintiff saying that since that room was under the control of HR, she would rather reach out to a colleague of hers in HR.

A few minutes later, Plaintiff's supervisor Georgia Gordon asked Plaintiff to see her in her office. When Plaintiff met her, she told Plaintiff that Michael Colon had just bitterly complained to her that Plaintiff refused to reserve meeting space for a client meeting as requested. Plaintiff was in utter shock. Plaintiff narrated everything that transpired. Plaintiff's supervisor sent Michael Colon an email which she read out to Plaintiff beforehand, explaining to Michael Colon what he already knew—that there was no available suitable space for the meeting at the time Nicole wanted the space. Plaintiff's supervisor said that Michael Colon said that contrary to Plaintiff's report that there was no available meeting space at the time, that the "Audiovisual" room (called Auditorium) on the 19th floor was available and that Plaintiff refused to reserve it for Nicole. Plaintiff explained to his supervisor that Plaintiff was instructed by the Defendant in

writing that the Auditorium was a special space with restricted usage; it was not designed for use as conventional meeting space, and no food or drink was allowed to be served in it.

Michael Colon knew all of that because the configuration, uses and restrictions on all the event spaces on all the floors occupied by the Defendant were put in place and supervised by Michael Colon and Milan Patel. Furthermore, Michael Colon regularly called Plaintiff when he wanted to give instructions or get information from Plaintiff. He could have called Plaintiff to find out why a client or employee did not get a space assigned. But he chose to make a false complaint to Plaintiff's supervisor as part of his continued campaign to falsely accuse the Plaintiff and create justification for adverse employment actions against the Plaintiff. He was so biased against Plaintiff that he was out to have Plaintiff relieved of the job.

b. *Jenna Lee and Dorothee Peuze photography incident*

It had been a longstanding policy and instruction of Michael Colon and Milan Patel to Plaintiff that visitors or employees of the bank were not allowed to take pictures on the 19th floor unless authorized. The reason given by Michael Colon and Milan Patel was that the 19th floor was essentially C-Suit floor and that the Defendant's leadership employees were entitled to a certain level of privacy. There had been two instances where employees wanted to take pictures on the 19th floor reception and asked Plaintiff if it was okay to do that; Plaintiff called Michael Colon and Milan Patel's office to get advice on the matter. Two security guards named Luis and Mitchel Gregory told Plaintiff that, as per Michael Colon and Milan Patel's directive, Plaintiff should not allow anyone take pictures on the floor.

One morning, Plaintiff had just arrived for work and settled down to attend to so many emails and other tasks on his work desk. Then Plaintiff saw some people taking pictures in the

reception area of the 19th floor. The only person Plaintiff immediately recognized was one employee of the Defendant named Dorothee Peuze.

Eventually the man who had a camera asked Plaintiff if he (Plaintiff) could briefly leave his workspace for them to take pictures there. Plaintiff obliged because Plaintiff was trying to avoid any argument that would precipitate into any complaint against him knowing that Michael Colon and Milan Patel would always stand against him, no matter the circumstances. After several shots, they left, and Plaintiff went back to his desk to continue working. After a few minutes, the group came back, and the man with the camera again asked Plaintiff to let them use his workspace to take shots. Again, Plaintiff obliged.

This back-and-forth continued for a long time, at which time Plaintiff asked the one with the camera how long it would take for them to finish so that he could occupy his workspace to attend to so many tasks pending. He said he didn't know. Soon, one other employee of the Defendant Jenna Lee came to the reception area. Plaintiff approached her and told her what was happening. She said she was aware of the photo shoot. Plaintiff asked her if she knew how long the activity would take. She said it was not certain. Plaintiff then went on to call Milan Patel. Milan said he was not aware of any planned or authorized photo shoot, but that Plaintiff should just step away until they finished. So did the Plaintiff.

A couple of minutes later, Plaintiff's supervisor summoned him (Plaintiff) to a room (so-called Gold Room) on the 19th floor. She also invited the chef Theresa Cappelli. She then told Plaintiff that Michael Colon reached out to her complaining angrily that Plaintiff tried to prevent Defendant's employees from taking pictures on the 19th floor. Plaintiff recounted everything that happened. In that meeting, Plaintiff again told the supervisor that Michael Colon's constant

biased and unnecessary complaints to her against him had become intolerable and negatively affecting his work. The supervisor's response was that Michael Colon complaints against him would lead to adverse actions against him, including termination if demanded by Michael Colon or Milan Patel. She said the issue was not how innocent Plaintiff was, rather what Michael Colon or Milan Patel wanted.

Plaintiff made it clear to the supervisor and Theresa that he would take legal actions if adverse actions were taken against him based on discriminatory bias. The supervisor reiterated that Michael Colon and Milan Patel were not friendly to Plaintiff, and that she was constantly under pressure from both men for adverse employment actions to be taken against the Plaintiff, and that if it came to that, the Defendant's interest would prevail, no matter how unfair it was to Plaintiff. After the meeting when the supervisor had gone back to her office, when Plaintiff approached Theresa Cappelli and expressed frustration with the things going on, Theresa advised Plaintiff that since Michael Colon and Milan Patel did not like him, he should look for another job and leave instead of enduring and protesting.

c. *The visitor's picture of Plaintiff without permission*

On April 22, 2022, a lady, using her mobile phone, took picture of Plaintiff without prior information or permission. Before Plaintiff could turn around to speak with her, she went into the elevator and left the floor. Plaintiff decided to report this to his supervisor and provided her with information to assist her locate the lady. Plaintiff told his supervisor that he did not want his image so acquired to be retained. The supervisor later forwarded email exchanges between her, the lady, and the person the lady was reportedly visiting with regarding the incident.

The same day, Plaintiff's supervisor told Plaintiff that she decided to handle the matter without involving Michael Colon and Milan Patel. Ordinarily, she should contact Michael Colon or Milan Patel to reach out to the bank employee and the lady in question to deal with the matter. She explained that she knew that as far as the issue concerned the Plaintiff, Michael Colon and Milan Patel would surely have a biased response against the Plaintiff.

Surely, several days later, Plaintiff's supervisor told Plaintiff that the persons involved had eventually reported the incident and that Michael Colon and Milan Patel were upset that Plaintiff dared to complain, and she bothered to approach those involved.

d. *Joycelyn Fernandez incidents*

An administrative assistant named Joycelyn Fernandez was in the habit of trying to issue instructions to Plaintiff. Her role relative to Plaintiff's job was to send Plaintiff requests for space booking and catering orders; while Plaintiff did the space reservation, as for the catering orders, Plaintiff's role was to pass them to catering attendants for preparation and timely setup. No matter how Plaintiff explained the process and Plaintiff's role to her, she kept pestering Plaintiff with demands that were not Plaintiff's job. She then started spreading damaging gossips against Plaintiff to anyone who cared to listen and wrote Plaintiff emails that had disregarding tones.

Plaintiff reported this to his supervisor. Her excesses continued, so Plaintiff escalated the matter to Michael Colon, especially as the supervisor was not at work at the time. What Plaintiff expected was proper investigation, corrections or advice. A few days later, Plaintiff's supervisor contacted Plaintiff asking what he (Plaintiff) did "again" that Michael Colon and Milan Patel were livid about. Plaintiff told her of the development, and again reported to her that he was being harassed by Michael and Milan.

10

Later, Plaintiff's supervisor invited Plaintiff to her office and told Plaintiff that Milan Patel came to her office very early in the morning to, again, demand action against Plaintiff. She then additionally told Plaintiff that Michael Colon and Milan Patel had effectively made a definite demand for Plaintiff to be decisively "dealt with", and that accordingly, adverse actions against Plaintiff were imminent. She equally told Plaintiff that Michael Colon and Milan Patel made relentless negative reports and complaints against him every other day that at times she was so frustrated that she wanted to walk out of the office to get relief from the pressure. She said it was so bad that any time Michael Colon or Milan Patel called or emailed her, she was full of apprehension that the calls or emails were fresh complaints against him (Plaintiff) from both men.

Plaintiff's supervisor informed Plaintiff that she had, based on the demands of the Defendant, contacted Robert Mapes, a Vice President at Aramark and the HR of Aramark for the purpose of taking employment actions against the Plaintiff. She advised Plaintiff to dust off his resume and be prepared for imminent adverse employment action. She further informed Plaintiff that she was convinced that Michael Colon and Milan Patel's antagonistic behaviors towards him were motivated by racial bias, and that their desired outcome was to terminate Plaintiff's employment.

***Labor Misclassification: Plaintiff, supposed as vendor, is treated as employee***

20. In November of 2020, the Plaintiff was informed by Ross Chasko that, after review of the resume of the Plaintiff,  that the Defendant, upon the recommendation of Aramark Services Inc, a business partner to the Defendant, had approved for the Plaintiff to work

for the Defendant as "Event/Catering Coordinator". On December 9, 2020, the Plaintiff started the work.

21. Whereas Aramark Services Inc, acting on behalf of the Defendant, gave the Plaintiff the impression that the work relationship between the Plaintiff and the Defendant was independent contractor, soon after the Plaintiff started working for the Defendant, the Defendant started treating the Plaintiff as an employee while denying the Plaintiff the remuneration and other benefits accorded all other employees of the Defendant.

22. First of all, Milan Patel and Michael Colon instructed the Plaintiff to undergo training by Javier Lugo right in their office on the 14th Floor for their department's procurement invoice processing so that Plaintiff would start handling that task for them. The training lasted several days.

23. Secondly, based on Milan Patel's authorization, Lara Yacoub, the head of GSP Unit/Department of the Defendant, directed and had Chrystal Maggio, Melissa Diamond, and Leon Durand, all of GSP, train Plaintiff as procurement invoice and accounting processing worker. Among other things, the aim was to have Plaintiff take over the duties of Melissa Diamond who was going on medical leave.

24. Furthermore, following Michael Colon's instruction, one senior employee of the Defendant named "Gaelle" invited Plaintiff to her office and trained him to operate and administer the Defendant's software package for collating and analyzing staff attendance data covering New York, Chicago, New Jersey and Houston locations for onward daily, weekly and monthly reporting to the highest management team of the Bank, including the CEO.

25. The Defendant also put the Plaintiff in charge of on-boarding Defendant's employees on the Defendant's daily Covid-19 health certification mobile app. In this role, Plaintiff was responsible for ensuring that new employees registered for the daily health certification.

26. Plaintiff also received direct instructions from the then CEO Marc-Andre Poirier to research staff attendance data and present details of employees with high repeated on-site absences to him for disciplinary actions. The Defendant's head of Human Resource, Moira Bannon was aware of this because based on Plaintiff's report, the CEO would invite her to discuss Plaintiff's report. Moira Bannon was also one of the Defendant's leadership team Plaintiff was instructed to send daily, weekly, and monthly reports on staff headcount to.

27. With all these tasks, the Defendant directly directed and supervised Plaintiff's work on routine basis so much so that when it was falsely reported to Milan that Plaintiff did not carry out some accounting tasks, Milan quickly sent Plaintiff an email on December 23, 2021 basically ordering Plaintiff to carry out the said accounting tasks. Such was the degree of control and supervision by the Defendant of the Plaintiff that Plaintiff's supervisor Georgia Gordon told Plaintiff and Theresa Cappelli that it seemed to her that to the Defendant, Plaintiff had become the Defendant's employee and that Plaintiff's Event Coordination work had become secondary.

28. Despite treating the Plaintiff as an employee, the Defendant did not accord the Plaintiff any benefit of employment, nor did the Defendant provide any form of compensation to the Plaintiff for all the additional work responsibilities placed on him outside the role for which he was hired. Rather, when the Plaintiff complained of possible FLSA violation and exploitation on December 8, 2021, in retaliation, the Defendant's response was to

send Plaintiff home for two weeks, followed by increased hostility and pressure to have Plaintiff terminated.

29. As a direct result of the harassment, discrimination, hostile work environment, on May 15 2022, Plaintiff was forced by the intolerable work atmosphere to resign after all attempts to get Defendant to cease the mistreatments did not yield any improvement.

## COUNT I

**Title VII – Discrimination and retaliation on the basis of race and national origin**

30. Plaintiff, Anthony Izuogu, re-alleges the foregoing paragraphs as though set forth herein.

31. The plaintiff is a member of a protected class on the basis of race as he is a Black African of Nigerian origin.

32. Plaintiff was performing his job in line with legitimate business expectations of the defendant.

33. The defendant discriminated against the plaintiff as described above, including but not limited to subjecting the plaintiff to sustained discriminatory harassment, intimidation, hostile work environment and labor misclassification.

34. Defendant discriminated against plaintiff by retaliating against the plaintiff for engaging in protected activity such as protesting discriminatory harassment, intimidation and labor exploitation as described above.

35. Defendant's actions were willful and wanton disregard for the rights of the Plaintiff under Title VII of Civil Rights Act 1964.

36.  The direct and proximate consequences of the Defendant's violations of the Plaintiff's rights include, but not limited to emotional distress, health issues, humiliation and degradation, loss of employment and wages.

### COUNT II

### New York State Human Rights Law – Discrimination and retaliation on the basis of race and national origin

37. Plaintiff, Anthony Izuogu, re-alleges the foregoing paragraphs as though set forth herein.

38. The plaintiff is a member of a protected class on the basis of race as he is a Black African of Nigerian origin.

39. Plaintiff was performing his job in line with legitimate business expectations of the Defendant.

40. The Defendant discriminated against the Plaintiff as described above, including but not limited to subjecting the Plaintiff to sustained discriminatory harassment, intimidation, hostile work environment and labor misclassification.

41. Defendant discriminated against Plaintiff by retaliating against the Plaintiff for engaging in protected activity such as protesting discriminatory harassment, intimidation and labor exploitation as described above.

42. Defendant's actions were willful and wanton disregard for the rights of the plaintiff under New York State Human Rights Law.

43.  The direct and proximate consequences of the Defendant's violations of the Plaintiff's rights include, but not limited to emotional distress, health issues, humiliation and degradation, loss of employment and wages.

## COUNT III

**New York City Human Rights Law – Discrimination and retaliation on the basis of race and national origin**

44. Plaintiff, Anthony Izuogu, re-alleges the foregoing paragraphs as though set forth herein.

45. The Plaintiff is a member of a protected class on the basis of race as he is a Black African of Nigerian origin.

46. Plaintiff was performing his job in line with legitimate business expectations of the Defendant.

47. The Defendant discriminated against the Plaintiff as described above, including but not limited to subjecting the Plaintiff to sustained discriminatory harassment, intimidation, hostile work environment and labor misclassification.

48. Defendant discriminated against plaintiff by retaliating against the Plaintiff for engaging in protected activity such as protesting discriminatory harassment, intimidation and labor exploitation as described above.

49. Defendant's actions were willful and wanton disregard for the rights of the Plaintiff under New York City Human Rights Law

50.  The direct and proximate consequences of the defendant's violations of the Plaintiff's rights include, but not limited to emotional distress, health issues, humiliation and degradation, loss of employment and wages.

## Count IV

**42 U.S.C. § 1981—Discrimination and Retaliation on the Basis of Race**

51. Plaintiff, Anthony Izuogu, re-alleges the foregoing paragraphs as though set forth herein.

52. The Plaintiff is a member of a protected class on the basis of race as he is a Black African of Nigerian origin.

53. Plaintiff was performing his job in line with legitimate business expectations of the Defendant.

54. The Defendant discriminated against the Plaintiff as described above, including but not limited to subjecting the Plaintiff to sustained discriminatory harassment, intimidation, hostile work environment and labor misclassification.

55. Defendant discriminated against Plaintiff by retaliating against the Plaintiff for engaging in protected activity such as protesting discriminatory harassment, intimidation and labor exploitation as described above.

56. Defendant's actions were willful and wanton disregard for the rights of the Plaintiff under 42 U.S.C. § 1981.

57.  The direct and proximate consequences of the Defendant's violations of the Plaintiff's rights include, but not limited to emotional distress, health issues, humiliation and degradation, loss of employment and wages.

**Count V**

**FLSA – Worker Misclassification**

58. Plaintiff, Anthony Izuogu, re-alleges the foregoing paragraphs as though set forth herein.

59. The Defendant, despite treating the Plaintiff as an employee, knowingly denied him all the benefits he was entitled to as an employee.

60. The Defendant, through compulsion and deceit, knowingly sought to and actually took advantage of the Plaintiff by deriving valuable work from the Plaintiff without any form of compensation.

61. Defendant's actions were willful and wanton disregard for the rights of the Plaintiff under Title VII, in violation of FLSA and New York Labor Laws

62. The direct and proximate consequences of the defendant's violations of the Plaintiff's rights include, but not limited to emotional distress, health issues, humiliation and degradation, loss of wages and other benefits.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Izuogu prays that this Court:

A. Enter judgment against the Defendant in favor of Plaintiff for violations of Plaintiff's rights under Title VII, 42 U.S.C. § 1981,  42 U.S.C. §§ 2000e to 2000e-17, New York State Human Rights Law, New York City Human Rights Law, and all other relevant law;

B. Declare that the Defendant has vicarious liability for the actions of its agents Milan Patel and Michael Colon;

C. Declare that the actions of Defendant constituted unlawful workplace discrimination;

D. Award Plaintiff compensatory damages in wages and benefits and for emotional distress;

E. Declare that the Defendant willfully misclassified Plaintiff and that the Plaintiff was constructively and effectively an employee of the Defendant and not an independent contractor;

F.  Following from the above willful misclassification in violation of FLSA, Plaintiff prays this Court to award Plaintiff, in addition to denied benefits and wages, interest on monetary value of the said benefits and wages calculated from the date the Defendant started treating the Plaintiff as an employee till the day the Defendant makes complete payment of monetary value of the said benefits and wages;

G.  Award Plaintiff non-taxable legal costs in this action;

H.  Award Plaintiff such and all other and further relief as the Court deems just and equitable.

Dated: June 2, 2024

Respectfully submitted,

_____

Anthony Izuogu

1520 Richardson Drive

Apt. 521

Richardson

Texas, 75080

anthoizu@yahoo.com

929-232-5631

# Exhibit B

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/29/2024

**To:** Anthony I Izuogu
1520 Richardson Drive
Apt 521
Richardson NJ 75080

Charge No: 16G-2022-02649

EEOC Representative and email:    HERNAN MORALES
State and Local Program Manager
HERNAN.MORALES@EEOC.GOV

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Yaw Gyebi, Jr.
02/29/2024

Yaw Gyebi, Jr.
District Director

**Cc:  Credit Agricole CIB**
**Attn: Michael Colon – President/CEO**
**1301 Avenue of the Americas**
**New York NY 10017**


**Herbert Smith Freehills New York LLP**
**Attn: Barbara Roth – Esq**
**450 Lexington Avenue**
**New York NY 10017**

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 16G-2022-02649 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 16G-2022-02649 to the District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

Exhibit A



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of<br><br>ANTHONY IZUOGU,<br><br>            Complainant,<br><br>        v.<br><br>CREDIT AGRICOLE CIB, MICHAEL COLON, MILAN PATEL,<br><br>            Respondents. | DETERMINATION AND ORDER AFTER INVESTIGATION<br><br>Case No.<br>10217432 |

Federal Charge No. 16GC202649

On 6/14/2022, Anthony Izuogu filed a complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation, national origin in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

After investigation, and following opportunity for review of related information and evidence by the named parties, the Division has determined that there is NO PROBABLE CAUSE to believe that the respondents have engaged in or are engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

The Complainant, who is Black of Nigerian origin, and opposed discrimination, stated that he was hired as an event coordinator, but Milan Patell and Michael Colon added more tasks unrelated to his position, and he was told the additional tasks were temporary. The Complainant stated that the additional tasks started taking more of his time and attention, so much so that it started to affect his primary role. The Complainant stated that he asked the Respondents to remove those tasks from his daily duties. In response, the Complainant was subjected to criticism, incessant and frivolous reports to his manager as well as false accusations.

The Complainant stated that since they had him also managing booking of conference rooms and event spaces, he had to interface with administrative assistants of the bank. The Complainant stated that Jocelyn Fernandez, assistant, started sending him emails with

disrespectful and condescending tones. The Complainant reported the matter to Georgia Gordon, his manager, and implored her to help put that to a stop. Ms. Gordon later told him that she spoke with the assistant about his complaints; however, this behavior did not stop. The Complainant then escalated the matter to Michael Colon and provided Michael Colon with available evidence of the rude emails this assistant sent him. Michael Colon promised to resolve the matter. However, the Complainant stated that Michael Colon and Milan Patell, motivated by discriminatory prejudice against him, reached out to Gordon, his manager, to complain against him. The Complainant claims that the idea of him complaining against any perceived mistreatment was unacceptable.

The Complainant stated that Michael Colon and Milan Patel kept looking for every excuse to find fault with him, no matter the circumstance and facts. For instance, someone visited the bank, and while on the floor where he worked, she took pictures of him without prior notice or permission. The Complainant reached out to his manager and appealed to her that he did not want his picture taken and retained by a stranger. The Complainant claims that Michael Colon, and Milan Patel were upset that he objected to his picture being taken and retained by a bank client or visitor; and this is now being used to make an adverse decisions against him.

The Complainant stated that he believes that his status as a black and African immigrant influences their attitude towards him. The Complainant stated that he felt that he was not wanted for the position, so they had to find a reason to frustrate him out of this employment, especially by pressuring the vendor that gave him the employment into taking an adverse actions against him. The Complainant stated that the feedback he got was that as a vendor employee and not a direct hire, he did not expect or demand fair or equal treatment as direct hires. The Complainant stated that this discriminatory policy is evident in Michael Colon's and Milan Patel's attitude towards him.

The Respondent has a Food Services Management Agreement ("Agreement") with Aramark Services, Inc. ("Aramark") since March 1, 1994, in which Aramark provides food services and office services. In December 2020, Aramark assigned the Complainant, an Aramark employee, to work in the role of Administrative Coordinator/Aramark.

The Respondent stated that given the COVID-19 pandemic that was under way when Aramark assigned the Complainant to the Respondent's account at the end of 2020, most personnel at businesses in New York City were working remotely, and there were very few in-person meetings taking place. As a result, there were no catered events and meetings for the Complainant to coordinate. Therefore, consistent with his job description, the Complainant was assigned with certain administrative tasks, in particular the processing of invoices. Without these added tasks, the Complainant would have had little work to perform.

The Respondent stated that during the time the Complainant was assigned to its Aramark account, the Complainant reported to Aramark managers, Ross Chasko until November 2021, and Georgia Gordon from November 2021. In or about November 2021, the Complainant apparently told Gordon that his administrative tasks were interfering with his duties coordinating events, and according to Gordon, the Complainant asked to be relieved of his work processing invoices. Gordon asked Milan Patell, Head of Property and Corporate Services, if someone else

could perform the invoicing duties that had been assigned to the Complainant.  Patell agreed but said it would take some time to replace the Complainant in that role.  Gordon follow up with Patell on December 1, 2021, asking when the Complainant could be relieved of the invoicing responsibilities, and Patell responded on December 9, 2021, that it would likely take until January 2022 to replace the Complainant.  Patell also told Gordon that the upcoming holidays and the new COVID variant would probably reduce the Complainant's conference related tasks in upcoming weeks.  Gordon said she understood and would tell the Complainant.  Patell told Gordon, "We really appreciate the extra support [Izuogu] has been providing."

The Respondent stated that on December 8, 2021, the Complainant wrote to Patell, with a copy to his supervisor Gordon titled "work difficulty." The Complainant again complained that the "extra tasks put on my schedule" (i.e., the invoice assistance) were interfering with "my core responsibility of event coordination." Patell promptly responded, thanking the Complainant for his work, and saying it would take until late January to remove the invoice-related task from him. Patell asked the Complainant to speak with Matthew Noujaim in the Global Sourcing & Procurement ("GSP") Team to document the Complainant's progress on the invoicing. According to the Respondent's employees involved in the invoicing process, the Complainant never, contacted Matthew as instructed by Patell.

The Respondent stated that on December 23, 2021, Patell wrote to the Complainant, copying Gordon, telling the Complainant, "I understand you unilaterally decided to stop assisting with invoices without speaking with anyone. The team is now suffering a backlog of them. Please assist the GSP team immediately with that task." The Complainant responded on December 28, 2021, with copies to Gordon and Michael Colon, Vice President/Business Continuity Management, complaining that the invoicing tasks had not yet been taken over and saying that he was not the cause of the backlog.

The Respondent stated that months later, May 16, 2022, an Aramark representative Robert Mapes wrote to Patell to inform Patell that the Complainant had submitted his resignation to Mapes and Gordon. The Respondent stated that the Complainant offers no evidence of any arguably discriminatory conduct toward him by any person employed by them.

In rebuttal, the Complainant reiterated his complaint allegations.  He also stated that between May 2019 and September 2020, he was employed by Aramark to work at another investment bank and contrary to the situation at the Respondent, he was completely under the supervision, direction, and control of Aramark, and the previous firm was not allowed to have effective control over his work.  The Complainant stated that contrary to claims of the Respondent and Aramark, the Respondent, in conspiracy with Aramark Services Inc, misclassified him to suit their joint unwholesome motive of exploitation.

The Complainant questioned why the Respondent would hire an Event or Catering Coordinator knowing that there were no events to coordinate at that time.  He stated that a look at the catering order software called CaterTrax which he used to log and manage catering orders and Microsoft Outlook calendar from December 2020 when he started the work would be inconsistent with the claim that there were no events to coordinate. Additionally, it was not a normal practice for workers or employees to be drafted to do any available tasks when there was

occasional reduction in the tasks for which they were recruited. He does not know of any persons who were demanded to do other tasks outside their primary work with the excuse that there was "little work to perform."

The Complainant stated that the fact of the matter is that the Respondent's representatives, Michael Colon and Milan Patell, regarded him as an ever-available tool or relief worker to dump any tasks on. Milan Patell was designated as division head for the procurement team called GSP. The department was struggling with manpower shortage and instead of promptly increasing the department's workplace or do more process automation, Milan Patell decided to get free work from him. The Complainant stated that both Patell and his previous manager informed him that the work would be temporary, and his previous manager added that his job was not to process invoice or do any other things for the Respondent other than coordinate events.

The Complainant stated that there was no indication that the Respondent had appropriate discussions with Aramark about expanding his tasks. The Complainant stated that his Aramark manager, Ross Chasko, seemed to excuse it by saying that the extra tasks given to him by the Respondent were indicative of the Respondent's increasing trust in his abilities. The Complainant stated he saw it for what it is was: opportunistic exploitation mixed with intimidation based on his protected characteristic. The Complainant stated that what the Respondent saw in him was a Black African immigrant who could be exploited and humiliated with impunity. They hired him as an Event Coordinator and turned him into their errand boy.

The Complainant denied that he stopped "assisting with invoices" and refused to reach out to Chrystal Maggio, Susan, and Matthew. For all the months he did tasks for GSP, there was no time he refused or failed to cooperate with any of them regarding the tasks. They all had access to all his GSP invoice files and communications, either on shared network directories or via regular email exchanges.

The Complainant stated that Michael Colon and Milan Patell's responded to his email protesting disrespect and exploitation was instant retaliation. The Complainant stated that he complained about and opposed their demands and mistreatment. The Complainant stated that they had his supervisor send him home for about two weeks. The Complainant stated that there was no plans for him to take the holiday time off. The Complainant stated that he was retaliated and had nothing to do with holiday downtime or COVID-19 incidence.

The Complainant denied Michael Colon's accusation that he refused to reserve meeting space for a client. The Complainant stated that Michael Colon regularly called him when he wanted to give instructions or get information from him. He could have called him to find out why a client or employee did not get a space assigned, but he chose to make a false complaint to his supervisor as part of his continued campaign to create an impression of poor performance with his supervisor. The Complainant stated that it was his giving-a-dog-a-bad-name-before-hanging-it strategy. Colon was so biased against him that he was out to have Aramark relieve him of that role.

With regard to the photo incident, the Complainant stated that his supervisor called him and informed him that Michael Colon reached out to her complaining that he tried to prevent the Respondent's employees from taking pictures on the 19th floor. He told his supervisor that Michael Colon's constant bias and unnecessary complaints to her against him has become intolerable and negatively affecting his work. The Complainant stated that on April 22, 2022, a lady took picture of him without prior information or permission. Before he could turn around to speak with her, she went into the elevator and left the floor. The Complainant stated that his supervisor told him that she decided to handle the matter without involving Michael Colon and Milan Patell. Ordinarily, she should contact Michael Colon or Milan Patell to reach out to the bank employee and the lady in question to deal with the matter, but she knew that as far as the issue concerned him, Michael Colon and Milan Patell would have a biased response against him. A few weeks later, his supervisor told him that the persons involved had gone back to report the incident to Michael Colon or Milan Patell, and that they (Michael Colon and Milan Patell) were upset that he dared to complain, and she bothered to approach those involved.

The Complainant stated that an administrative assistant had a habit of trying to issue instructions to him. No matter how he explained the process and his role to her, she kept pestering him with demands that were not his job. She then started spreading damaging gossips against him to anyone who cared to listen and wrote him emails. He reported this to his supervisor. His supervisor contacted him, asking what he did and why was Michael Colon and Milan Patell were upset about. He told her of the development, and again reported to her that he was being harassed by Michael Colon.

The Complainant stated that his supervisor invited him to her office and told him that Milan Patell came to her office very early in the morning to demand action against him. She then told him that Michael Colon and Milan Patell had made a demand of Aramark to deal with him. Aramark was committed to making their business partner (Respondent) happy in order to preserve Aramark's interests. She equally told him that Michael Colon and Milan Patell made relentless negative reports and complaints against him every other day that at times she was so frustrated that she wanted to walk out of the office to get relief from the pressure. She said it was so bad that any time Michael or Milan Patell called or emailed her, she was full of apprehension that the calls or emails were fresh complaints against him from both men.

The Complainant stated that contrary to the Respondent's claim that he never complained of these discriminatory, harassing, and retaliatory behaviors and exploitations, he made complaints to Aramark through his supervisors. He was directed by his supervisor Georgia Gordon that he should report any problems he had to her and let her handle them. She promised him that if he went above her to complain to anyone, the matter would still be referred to her. Additionally, he complained to Michael Colon and Milan Patell that they were exploiting and disrespecting him where he was protesting unfair treatment, disrespect, false accusations, among other things.

The Complainant stated that Respondent had deep-rooted bias against him and treated him far worse than they treated anyone, singled him out for harassment, and retaliated against him for trying to oppose their illegal behaviors. The Respondent will attempt to do everything to

defend those employees because the Respondent has an obvious corporate culture that does not place high premium on actively preventing or deterring such offensive behaviors.

The Complainant did not proffer any evidence that he was subjected to disparate treatment or to a hostile work environment because of his class membership. The Complainant's allegations that he was subjected to a hostile work environment all revolve around the Complainant's dissatisfaction with supervision. The Complainant did not cite any examples of comments or actions by Michael Colon, Milan Patell or any other Respondent employee that could be deemed as harassment or that would constitute a hostile work environment. Furthermore, none of the Complainant's allegations regarding his work interactions with Michael Colon and Milan Patell have any connection to the Complainant's race/color or national origin.

The investigation did not reveal evidence that the Complainant was subjected to discriminatory workplace harassment. The Complainant alleged that he received added duties that did not pertain to the role he was hired for, and that the Respondents subjected him to discriminatory treatment and retaliation because he complained. The record shows that once he complained to his supervisor, they reached out to the Respondents, and the Respondents agreed that he would no longer have the Complainant to continue performing those tasks. However, the Complainant was asked to continue to perform the tasks until January 2022. There is no indication in the record, other than the Complainant's assertion, that he was asked to perform these tasks because of his race or national origin. Based on the Complainant's own description of events, it appears that the Respondents requested that the Complainant assist in the added duties because of Respondent's business needs.

The Complainant only made bare assertions that he was discriminated against on the basis of race/color and national origin. The Complainant's mere belief and conclusory allegations that he was discriminated against because he is Black and Nigerian is insufficient to establish a nexus to the Respondents' actions.

The investigation revealed that although the Complainant complained about alleged harassment and hostile work environment, there is no evidence in the record that the Complainant complained that he was subjected to the alleged treatment because of his class membership. Therefore, the Complainant's internal complaints do not constitute protected activity and the Complainant cannot establish the requisite causal connection between protected activity and an adverse employment action.

The investigation did not reveal sufficient evidence to establish an inference of discrimination based on race/color, national origin or opposed discrimination/retaliation. Furthermore, there is no evidence in the record that the Complainant was constructively discharged because of an animus against him because of his class membership.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and

Petition <u>within sixty (60) days after service of this Determination</u>.  A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458.  DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964.  Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC).  You have the right to request a review by EEOC of this action.  To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112.  Otherwise, EEOC will generally adopt our action in your case.

Dated:      January 2, 2024
            New York, New York

STATE DIVISION OF HUMAN RIGHTS

By:      *David E. Powell*
         _____
         David E. Powell
         Regional Director